IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 08-80636-Civ-Marra/Johnson


FLORIDA HOMETOWN DEMOCRACY, INC.,
PAMELA WINCHESTER, BARBARA HERRIN,
SUSAN DUNN, JOHN DUNN, NANCY LEE,
JOSEPH FLORIO, JANET STANKO and JOYCE
TARNOW,

          **Plaintiffs,**

    v.

KURT BROWNING, in his Official Capacity as
Florida Secretary of State,


          **Defendant.**

_____/


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION**


GARY SINAWSKI
180 Montague Street 26th Floor
Brooklyn, NY 11201
(516) 971-7783

LESLEY BLACKNER
Florida Bar No. 654403
123 Australian Avenue
Palm Beach, FL 33480
(561) 659-5754

ROSS STAFFORD BURNAMAN
Florida Bar No. 397784
1018 Holland Drive
Tallahassee, FL 32301
(850) 942-1474

Attorneys for Plaintiffs

## INTRODUCTION

The plaintiffs are the sponsor of a citizens' initiative to amend the Florida constitution ("Hometown Democracy"), two of its officers, and several other Florida electors. The defendant is the chief elections officer of Florida, Fla. Stat. §§ 15.13 and 15.01 (2007). The individual plaintiffs have all signed and circulated the Hometown Democracy petition and donated money to Hometown Democracy, and they all want to support and vote for the proposed amendment in the general election on November 4, 2008.  Complaint, ¶¶ 1, 11.

The proposed constitutional amendment sponsored by Hometown Democracy would condition the adoption or amendment of a local government's comprehensive land use plan upon final approval by the local electorate in a referendum. Complaint, ¶¶ 2, 8. In order to gain access to the November 2008 ballot, the proponents of a citizens' initiative such as the Hometown Democracy initiative must obtain petition signatures equal in number to eight percent of the votes cast in the 2004 presidential election in each of one-half of Florida's congressional districts and in Florida as a whole. Fla. Const. Art. XI § 3. Based on the results of the 2004 election, a total of 611,009 signatures must be obtained, and the eight-percent threshold must be met in at least 13 of Florida's 25 congressional districts.

At the November 2004 general election a constitutional amendment, initiated by joint legislative resolution, was enacted which advanced the petition filing deadline for a proposed constitutional amendment motivated by a citizens' initiative from 90 days before the election at which the amendment is to be considered to February 1 of the election year. S. Jt. Res. 2394, 2007 Sess. The filing deadline for amendments motivated

by any of the other four methods permitted in Fla. Const. Art. XI (viz, joint legislative resolution, revision commission, constitutional convention, and taxation and budget reform commission) was left intact at 90 days before the election. Complaint, ¶ 16. By administrative fiat, defendant's Division of Elections ("DOE") further advanced the filing deadline for citizens' initiative petitions to December 31 *of the year preceding the election*. Complaint, ¶ 24 and Ex. B.

During its 2007 session the Florida legislature enacted several amendments to Fla. Stat. § 100.371, which further regulates citizens' initiatives. One amendment, effective August 1, 2007 but made retroactive 150 days by emergency regulations adopted by the DOE, permitted signers to revoke their signatures on initiative petitions for the first time in Florida history. This amendment was invalidated by Florida's First District Court of Appeals on April 23, 2008.  Florida Hometown Democracy v. Browning, 980 So.2d 547, (Fla. 1 Dist. Ct. App. April 23, 2008). Defendant has appealed this decision to the Florida Supreme Court. (Case No. 08-884)

Another amendment, to Section 100.371(8), restricted petition circulators' access to the public by giving shopping malls and other commercial establishments erected on privately owned property the unfettered discretion to permit the circulation of some initiative petitions on their premises but to forbid the circulation of others. Complaint, ¶ 22.

Notwithstanding these inhospitable constitutional and statutory changes, Hometown Democracy was able to file some 820,034 petition signatures with the county supervisors of elections ("SOEs") before February 1, 2008, the new statutory deadline. Complaint, ¶ 25.  On February 1, 2008 the DOE website credited Florida Hometown

Democracy with 564,558 valid signatures (583,299 minus 18,741 revocations). This total was subsequently revised upward by 6,886 signatures due to an alleged error in counting revocations. On July 3, 2008 the DOE website credited Florida Hometown Democracy with 588,673 valid signatures (601,855 minus 13,182 revocations).

The DOE signature count is understated and unreliable for a variety of reasons, most notably the "double counting" of many revocations; the utilization of disparate signature-verification criteria by the various SOEs, many of which vary wildly from the statutory verification criteria set forth in Fla. Stat. § 100.371(3) (2007); and other mistakes made by the SOEs and their data processing systems in verifying, tallying and certifying petition signatures.  Complaint, ¶¶ 26 - 30; Herrin Affidavit filed herewith as Ex. 2, ¶¶ 14, 20, 21, 22 and 30 and Ex. J.

Recognizing that the signature-verification procedures are replete with errors and inconsistencies, the defendant on June 26, 2008 promulgated two new emergency rules, effective July 1, 2008, concerning the initiative petition and revocation process. The section of each rule entitled "Specific Reasons for Finding an Immediate Danger to the Public Health, Safety or Welfare" provides in relevant part as follows:

> The statewide voter registration system was designed for recording voter registrations, not signatures on initiative petitions. In the past, discrepancies have existed in the numbers of signatures being verified in the statewide voter registration system for initiative petitions.  These discrepancies seriously undermined the reliability of the number of signatures recorded in the statewide voter registration system. *The Secretary of State lacks confidence in the accuracy of signature verification numbers reported in the statewide voter registration system*.[1]

(Emphasis added.)  Herrin aff., Ex. P.

---

[1] Prior to the effective date of the new emergency rules, the SOEs were required to report their signature-verification numbers in the statewide voter registration system.

Plaintiffs now seek a preliminary injunction prohibiting defendant and his agents from enforcing the early filing deadline (whether it be February 1 or December 31) and the other ballot access restrictions about which plaintiffs complain and directing defendant to place the Hometown Democracy amendment on the November 4, 2008 ballot.

## STATEMENT OF FACTS

The relevant facts are as stated above and in the complaint and the declarations and exhibits accompanying this motion, to which the Court is respectfully referred.

## ARGUMENT

### I.    THE STANDARDS FOR A PRELIMINARY INJUNCTION

In this Circuit a preliminary injunction may be granted only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. KH Outdoor, LLC v. City of Trussville, 458 F.3d. 1261, 1268 (11th Cir. 2006), citing Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

### II.   PLAINTIFFS ARE ENTIRELY LIKELY TO SUCCEED ON THE MERITS

The Supreme Court has determined that the considerations utilized to evaluate the constitutionality of restrictions on access to the ballot by candidates and political parties apply also to the evaluation of restrictions on citizens' initiatives. Buckley v. American Constitutional Law Foundation, 525 U.S. 182 (1999) (holding that the First Amendment guarantee of free speech was violated by Colorado statutes requiring that the circulators

of initiative petitions be registered voters and wear identification badges disclosing their

names and that the proponents of initiatives report the names and addresses of paid

circulators and the amount paid to each); <u>Meyer v. Grant</u>, 486 U.S. 414 (1988) (holding

that Colorado's prohibition against payment for the circulation of initiative petitions

inhibited core political speech involving interactive communication about political

change, without sufficient cause for doing so). In a separate opinion concurring in the

judgment in <u>Buckley</u>, Justice Thomas observed that "[w]hen a State's election law

directly regulates core political speech, we have always subjected the challenged

restriction to strict scrutiny and required that the legislation be narrowly tailored to serve

a compelling governmental interest [citations omitted]." <u>Id</u>. at 207.

     As in the arena of ballot access for candidates and parties, the Supreme Court has

drawn a distinction between "necessary or proper ballot access controls" and "restrictions

that unjustifiably inhibit the circulation of ... petitions." <u>Id</u>. at 205. The latter restrict core

political speech by imposing a direct and substantial burden on one-on-one

communication and are ordinarily subject to strict scrutiny; the former are "a step

removed from the communicative aspect of petitioning and are necessary to maintain an

orderly electoral process" and, as such, are ordinarily subject to a less exacting standard

of review. <u>Id</u>. (O'Connor, J., concurring in the judgment). These distinctions have been

elaborated by the Eleventh Circuit. See e.g., <u>Biddulph v. Mortham</u>, 89 F.3d 1491 (11th

Cir. 1996) (upholding Florida requirements that initiative proposals to amend the

Florida constitution be limited to a single subject and have an unambiguous title).

     Below, plaintiffs summarize the standards developed by the Supreme Court for

adjudicating the constitutionality of ballot access restrictions and demonstrate that defendant and his agents have violated plaintiffs' First Amendment speech and associational rights by denying them access to the November 2008 ballot on account of Florida's new February 1 deadline for citizens' initiative petitions, the inconsistent criteria applied by the SOEs to determine the validity of petition signatures, and the other ballot access restrictions about which plaintiffs complain.

## A.    THE STANDARDS FOR ADJUDICATING THE CONSTITUTIONALITY OF BALLOT ACCESS RESTRICTIONS

The Supreme Court has cautioned that while the administration of the election process is largely entrusted to the states, they may not infringe on basic constitutional protections. Kusper v. Pontikes, 414 U.S. 51, 57 (1974), citing Dunn v. Blumstein, 405 U.S. 330 (1972).

Williams v. Rhodes, 393 U.S. 23, 30 (1968) (holding that Ohio's election laws making it virtually impossible for a minor party to access the presidential election ballot were unconstitutional), the first case in which the Court addressed the constitutional status of state ballot access restrictions, considered the nature of the rights implicated by such restrictions. The Court noted that such restrictions

> place burdens on two different, although overlapping, kinds of rights -- the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.

Many ballot access restrictions are, of course, justified by the state's legitimate regulatory interests. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." Storer v. Brown, 415 U.S. 724, 730 (1974).

The Court has described the trial court's task in evaluating a constitutional challenge to a state-imposed restriction on access to the ballot as follows:

> It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged [restriction] is unconstitutional.

Anderson v. Celebrezze, 460 U.S. 780, 789 (holding that Ohio's March filing deadline for independent presidential candidate petitions was unconstitutionally burdensome).[2]

In Burdick v. Takushi, 504 U.S. 428, 433-34 (1992) (upholding Hawaii's prohibition against write-in voting in the context of a regulatory framework providing for easy access to the ballot) the Supreme Court endorsed the Anderson methodology and examined the circumstances in which different levels of scrutiny should be applied, stating:

> Election laws will invariably impose some burden upon individual voters. Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects – at least to some degree -- the individual's right to vote and his right to associate with others for political ends [citing Anderson at 788]. Consequently, to subject every voting regulation to strict

---

[2] The Anderson Court based its analysis on the First and Fourteenth Amendments generally and did not explicitly engage in a separate equal protection analysis. The Court stated, however, that it "rel[ied] ... on the analysis in a number of our prior election cases resting on the Equal Protection Clause of the Fourteenth Amendment," Id. at 786 n. 7, and indicated that those cases had been correctly decided. The earlier cases referred to by the Court all employed traditional equal protection analysis but with varying levels of scrutiny. See Williams v. Rhodes, supra; Jenness v. Fortson, 403 U.S. 431 (1971); Storer v. Brown, 415 U.S. 724 (1974); American Party of Texas v. White, 415 U.S. 767 (1974), rehearing denied, 417 U.S. 926; Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173 (1979).

scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently. * * *

* * *

Under [the "more flexible standard" applied in <u>Anderson</u>], the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." <u>Norman v. Reed</u>, 502 U.S. ___, ___, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions [citing <u>Anderson</u> at 788] ....

The Eleventh Circuit has characterized the Anderson approach, as informed by <u>Burdick</u>, as "a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending upon the factual circumstances in each case." <u>Duke v. Cleland</u>, 5 F.3d 1399, 1405 (11th Cir. 1993), citing <u>Fulani v. Krivanek</u>, 973 F.2d 1539, 1543 (11th Cir. 1992).

Here, plaintiffs employ the <u>Anderson/Burdick</u> form of analysis by evaluating the injuries to plaintiffs' constitutional rights caused by the ballot access restrictions about which they complain; the state interests that could be asserted to justify those injuries; and in light of these considerations, the constitutionality of the restrictions.

**B.    THE INJURIES TO PLAINTIFFS' RIGHTS ARE SEVERE**

Plaintiffs' First and Fourteenth Amendment rights to cast their votes effectively and to associate for the advancement of political ideas have been seriously impaired. Foreclosing Hometown Democracy from access to the ballot unnecessarily limits the choices available to its voter-supporters. Their rights to associate for the advancement of political ideas and to cast their votes effectively in furtherance of those ideas are among

9

the most fundamental in our society. By denying the Hometown Democracy amendment

access to the ballot the defendant, applying the February 1 filling deadline and the other

restrictions on citizens' initiative petitions about which plaintiffs complain, has

thoroughly undermined the political speech and associational rights secured to plaintiffs

by the First and Fourteenth Amendments.

Using language as germane to the supporters of ballot initiatives as to candidates

and parties, the Supreme Court observed in <u>Anderson</u> at 787-88 that

> ... voters can assert their preferences only through candidates or parties or
> both.  "It is to be expected that a voter hopes to find on the ballot a
> candidate who comes near to reflecting his policy preferences on
> contemporary issues." [Citation omitted.] The right to vote is "heavily
> burdened" if that vote may be cast only for major-party candidates at a
> time when other parties or other candidates are "clamoring for a place on
> the ballot."  [Citations omitted.] The exclusion of candidates also burdens
> voters' freedom of association, because an election campaign is an
> effective platform for the expression of views on the issues of the day, and
> a candidate serves as a rallying point for likeminded citizens.

In determining the severity of the burden which that a ballot access restriction

imposes, a court must consider the restriction in the context of the totality of the state's

restrictions on access to the ballot. In the present case the newly-enacted early filing

deadline for citizens' initiative petitions, the newly-enacted right of signers to revoke

their signatures, the newly-enacted right of private property owners to selectively restrict

petitioning, the double-counting of revoked signatures, the disparate criteria used by the

SOEs to verify signatures, and the admitted malfunctioning of the state's computerized

signature-verification systems, combine to trammel the rights of the plaintiffs and their

supporters to engage in the core political speech entailed in circulating the Hometown

Democracy petition and voting on the proposed amendment. The severity of the injuries

to the instant plaintiffs' rights means that the standard of review to be applied here is

strict scrutiny; the state must demonstrate that the restrictions at issue are "... narrowly drawn to advance a state interest of compelling importance." Id. at 789.

Under the Anderson/Burdick test, "[o]nce a plaintiff has identified the interference with the exercise of her First Amendment rights, the burden is on the State to 'put forward' the 'precise interests' ... [that are] justifications for the burden imposed by its rule." Fulani v. Krivanek, supra at 1544, citing Anderson at 789.

## C.    THE STATE'S INTERESTS DO NOT JUSTIFY THE INJURIES WHICH ITS RESTRICTIONS HAVE CAUSED TO PLAINTIFFS' RIGHTS

Close analysis of whatever state interests the defendant may assert in his answering papers must necessarily be undertaken in plaintiffs' reply papers. However, it can be anticipated that the defendant, on behalf of the State of Florida and in support of the ballot access restrictions complained of, will put forward the State's interest in ensuring the integrity and orderly administration of its electoral process; its interest in requiring plaintiffs to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with frivolous matters, Anderson at 789 n. 9; its interest in administering the election processes as it sees fit; and its right to require that qualifying petitions for ballot initiatives be filed far enough in advance of the election to enable defendant to verify petition signatures and prepare ballots.

### 1.    THE STATE'S INTERESTS DO NOT JUSTIFY THE BURDEN IMPOSED BY THE EARLY PETITION FILING DEADLINE

Florida's deadline for filing citizens' initiative petitions was advanced from 90 days before the election at which the initiative is to be considered to February 1 of the election year.  Complaint, ¶ 16; Fla. Const. Art. XI. The deadline was further advanced

by the DOE to December 31 of the year preceding the election. Complaint, ¶ 24 and Ex. B. Plaintiffs assert that these deadlines are unconstitutionally early.

Upon information and belief, no court has ever upheld a petition-filing deadline set in the year preceding the election year; the earliest mandatory filing deadline ever upheld by a court is a North Dakota deadline set in mid-April of the election year. McLain v. Meier (II), 851 F.2d 1045 (8th Cir. 1988) (upholding mid-April deadline tied to date of primary election, which resulted from state moving its primary to an earlier date, where state had also lowered the signature requirement).

Note that the petition-filing deadline in the ballot access framework invalidated by the Supreme Court in Williams v. Rhodes, supra at 33, was set in February of the election year. Note also that the filing deadline which the Supreme Court struck down as unconstitutionally early in Anderson v. Celebrezze, supra at 782, was set in March of the election year. Deadlines for filing petitions to qualify political parties for the ballot were also determined to be unconstitutionally early in the following additional cases: Libertarian Party of Ohio v. Blackwell, 462 F.3d 579 (6th Cir. 2006) (Ohio - deadline in November of year preceding election); New Alliance Party of Alabama v. Hand, 933 F.2d 1568 (11th Cir. 1991) (Alabama - April deadline); Citizens to Establish a Reform Party in Arkansas v. Priest, 970 F. Supp. 690 (E.D. Ark. 1996) (Arkansas - January deadline); Libertarian Party of Kentucky v. Ehrler, 776 F. Supp. 1200 (E.D. Ky. 1991) (Kentucky - February deadline); MacBride v. Exon, 558 F. Supp. 443 (8th Cir. 1977) (Nebraska - February deadline); Libertarian Party of Nevada v. Swackhamer, 638 F. Supp. 565 (D. Nev.1986) (Nevada - April deadline); McLain v. Meier (I), 637 F.2d 1159

(8th Cir. 1980) (North Dakota - June deadline); <u>Populist Party v. Herschler</u>, 746 F.2d 656 (10th Cir.1984) (Wyoming - June deadline).

It appears that the only cases in which courts have upheld party qualifying deadlines earlier than July of the election year are: <u>McLain v. Meier</u> (II), supra (North Dakota - April deadline which resulted from state moving its primary to an earlier date was acceptable where state had reduced the signature requirement); <u>Rainbow Coalition of Oklahoma v. State Election Board</u>, 844 F.2d 740 (10th Cir. 1988) (Oklahoma - May deadline); <u>Fishbeck v. Hechler</u>, 85 F.3d 162 (4th Cir. 1996) (West Virginia – May deadline); and <u>Council of Alternative Political Parties v. Hooks</u>, 179 F.3d 64 (3d Cir. 1999) (New Jersey - June deadline).

The Supreme Court suggested in <u>Anderson</u>, supra, that a filing deadline of 75 days before a general election allows "a reasonable time for processing the documents ... and preparing the ballots. <u>Id</u>. at 800.

**2.    THE STATE'S INTERESTS DO NOT JUSTIFY THE BURDEN IMPOSED BY THE OTHER RESTRICTIONS ABOUT WHICH THE PLAINTIFFS COMPLAIN**

In addition to the early filing deadline, plaintiffs have challenged the constitutionality of several other restrictions on access to the ballot which they contend severely burden their First Amendment rights. (Their objections to the amendment to Fla. Stat. § 100.371 permitting petition signers to revoke their signatures will not be discussed here, as the invalidation of this provision by Florida's First District Court of Appeals is automatically stayed pending defendants' appeal to the Florida Supreme Court. Florida <u>Hometown Democracy v. Browning</u>, 980 So.2d 547 (Fla. 1st Dist. Ct. App. April 23, 2008) (appeal pending, SC08-884).

Plaintiffs assert that the recent amendment to Fla. Stat. § 100.371(8) permitting commercial enterprises to restrict petition circulators' access to the public on their premises is unconstitutional. Section 100.371(8) now provides in relevant part that "[n]o provision of this code shall be deemed to prohibit a private person exercising lawful control over privately owned property, including property held open to the public for the purposes of a commercial enterprise, from excluding from such property persons seeking to engage in activity supporting or opposing initiative amendments."

This amendment purports to allow the owners of commercial establishments which are held open to the public to prohibit the circulation of some initiative petitions on their premises while permitting the circulation of others. Several handbills disseminated by the Florida Chamber of Commerce provide that "[a] business is ... not prohibited from allowing some petition gatherers and prohibiting others, so this law will empower a property owner to make case-by-case decisions about what is in the best interests of its employees and the business," Complaint, ¶ 22; Herrin Aff., Ex. N. The amendment has been used to forbid the circulation of Hometown Democracy petitions and permit the circulation of other petitions, Id., and thereby to deny the plaintiffs and other similarly situated persons their right to equal protection of law. The interface between the right to engage in political speech and the rights of private property owners, acting independently of state law, to limit such speech, has been the subject of much litigation. However, the defendant cannot credibly assert that the *state* has a legitimate interest in empowering property owners to regulate petitioning.

Defendant has a statutory responsibility to ensure that the SOEs correctly implement state initiative procedures. §97.012(1) & (14), Fla. Stat. Defendant's failure

to remedy the use by the SOEs of disparate signature verification criteria deprives

plaintiffs, and others who are similarly situated, of due process and equal protection of

law. These disparate criteria are described in the Herrin Affidavit at ¶¶ 14, 20, 21, 22 and

30 and Exhibit K thereto. The permissible criteria for verifying signatures are set forth in

Fla. Stat. § 100.371(3) (2007), which provides in relevant part:

> (3) Each signature shall be dated when made and shall be valid for a period of 4
> years following such date, provided all other requirements of law are met. The
> sponsor shall submit signed and dated forms to the appropriate supervisor of
> elections for verification as to the number of registered electors whose valid
> signatures appear thereon. The supervisor shall promptly verify the signatures
> within 30 days of receipt of the petition forms and payment of the fee required by
> s. 99.097. The supervisor shall promptly record in the statewide voter registration
> system, in the manner prescribed by the Secretary of State, the date each form is
> received by the supervisor, and the date the signature on the form is verified as
> valid. The supervisor may verify that the signature on a form is valid only if:
>
> (a) The form contains the original signature of the purported elector.
>
> (b) The purported elector has accurately recorded on the form the date on which
> he or she signed the form.
>
> (c) The form accurately sets forth the purported electors name, street address,
> county, and voter registration number or date of birth.
>
> (d) The purported elector is, at the time he or she signs the form, a duly qualified
> and registered elector authorized to vote in the county in which his or her
> signature is submitted.

Thus, eight statutory criteria must be met for a signature to be deemed valid. The

petition must contain (1) the signer's original signature, (2) the date of signing, the

signer's (3) name, (4) street address, (5) county and (6) voter registration number or date

of birth, and the signer (7) must be a duly qualified and registered elector and (8) must be

authorized to vote in the county of signing. In spite of these eight statutory criteria, the

number of verification criteria used by the various SOEs varies from three in Baker,

DeSoto and Hamilton Counties to 21 in Palm Beach County. Herrin Aff., Ex. J.

The Supreme Court discussed the constitutional implications of arbitrary and

disparate standards for determining voter intent in <u>Bush v. Gore</u>, 531 U.S. 98, 104 (2000)

(holding, inter alia, that in the absence of specific standards for discerning voter intent,

manual recounts ordered by the Florida Supreme Court did not satisfy the requirement of

non-arbitrary treatment of voters necessary under the Equal Protection Clause to secure

the right to vote for President). The Court stated that

> [t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner if its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. See, *e.g., Harper v. Virginia Bd. Of Elections*, 383 U.S.663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (["O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment"). It must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise. *Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964.)

By analogy to the one-person, one-vote principle articulated by the Court in <u>Bush</u>

<u>v. Gore</u> and elsewhere, once having granted its citizens the right to place initiatives on the

ballot and to vote on them, Florida cannot then value one person's signature over that of

another by permitting the SOEs to apply arbitrary and disparate criteria for ruling on the

validity of signatures. Such a state of affairs transgresses the requirement of the Equal

Protection Clause that each signer of an initiative petition be accorded equal weight and

equal dignity. <u>Id</u>. "The problem inheres in the absence of specific standards to ensure []

equal application. The formulation of uniform rules ... is practical and, we conclude,

necessary." <u>Id</u>. at 106. The <u>Bush</u> majority relied in part on <u>Gray v. Sanders</u>, 372 U.S. 368

(1963) (holding that arbitrary and disparate treatment accorded by state to voters in

different counties violated the one-person, one-vote requirement of the Equal Protection

Clause) and <u>Moore v. Ogilvie</u>, 394 U.S.814 (1969) (invalidating a county-based procedure which diluted the influence of voters residing in larger counties in the nominating process). <u>Id</u>. at 107.

Yet another violation of the Equal Protection Clause is found in the defendant's failure to ensure uniform procedures for tallying valid and revoked petition signatures. An unknown number of revocations were "double counted" because some SOEs subtracted totals of revocations from totals of valid signatures, forwarding the net results to the DOE as total valids and total revocations, and the DOE again subtracted the total revocations from the total valids. The problem was acknowledged in a memorandum dated March 19, 2008 from the DOE to the SOEs. Complaint, ¶ 27 and Ex. C. This and other problems at the SOE-level have been exacerbated by the SOEs' use of different computer systems supplied by different vendors. Complaint, Ex. D; Herrin Aff., ¶ 13.

These inconsistencies were compounded by yet other factors: Some SOEs, inundated by the demands of preparing for the January 29 presidential preference primary, lacked the time and resources to properly verify petition signatures. The bedlam in their offices is described in <u>Diaz v. Cobb</u>, 541 F. Supp.2d 1319 (S.D. Fla. March 25, 2008) and in the Lee Affidavit filed herewith as Exhibit 3. Some SOEs refused to verify petition signatures filed in January.[3]  Some validated signatures but did not certify them to the DOE. Some misplaced petitions that were filed with their offices. As previously

---

[3] In spite of the new February 1 filing deadline, one of the plaintiffs was told by an SOE in mid-January that "the barn door was closed" and that no more Hometown Democracy petitions would be reviewed by his staff. Winchester Affidavit filed herewith as Exhibit 4, ¶ 8.

noted, many SOEs invalidated signatures on grounds other than those specified by Fla. Stat. § 100.371(3). Complaint, ¶¶ 23, 28. Herrin Aff., ¶¶ 19, 23 - 25.

Finally, the DOE recommended, but apparently did not require, that the SOEs verify petition signatures in the order received. Complaint, ¶ 24 and Ex. B. Some, though not all, of the SOEs followed this recommendation. It enabled Floridians for Smarter Growth, a PAC organized for the avowed purpose of derailing the Hometown Democracy initiative, to deluge the SOEs with approximately 657,753 petition signatures during the period immediately preceding the February 1 statutory deadline. Complaint, ¶ 23; Herrin Aff., ¶¶ 9, 36. Anyone who is familiar with the process of verifying initiative petition signatures, as the SOEs surely are, knows that Smarter Growth's eleventh-hour submission of 657,753 signatures was extremely unlikely to yield the 611,009 *valid* signatures required by statute. In contrast, Hometown Democracy's submission of 820,034 signatures was very likely to yield the number of valid signatures required by law. Herrin Aff., ¶ 16. Had verification of the Hometown Democracy signatures been given priority over verification of the Smarter Growth signatures, plaintiffs might well have attained access to the ballot in spite of the many problems with the SOEs' signature-verification processes described herein.

The defendant's recognition of these and other problems in the signature-verification process led him to promulgate the two new emergency rules which take effect on July 1, 2008.  The rules are described in the introduction to this memorandum and are set forth in full in Exhibit P to the Herrin declaration. The new rules are tantamount to an admission by defendant that the state's petition-processing system simply does not work.

### III.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY UNLESS THE INJUNCTION ISSUES

In Elrod v. Burns, 427 U.S. 347, 373-74 (1975), the Supreme Court made it clear that actual or threatened injury to First Amendment interests constitutes irreparable harm for preliminary injunction purposes. In that case the Court upheld the issuance of a preliminary injunction against patronage dismissals of Republican public employees by a Democratic official, at a point when the employees were discharged or threatened with discharge and members of the class they were seeking to have certified were threatened with discharge or had agreed to support the Democratic Party in order to avoid discharge. The Court stated:

> It is clear ... that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. See *New York Times Co. v. United States*, 403 U.S. 713 (1971). [Footnote omitted.]

Unless a preliminary injunction is issued in this case, plaintiffs will be forever deprived of the opportunity to have their proposed constitutional amendment placed before the Florida electorate in November 2008; the electorate will be forever deprived of the opportunity to vote for against the measure in November 2008; and plaintiffs will be forced to invest the effort and expense necessary to obtain many thousands of additional signatures in order to qualify for the general election ballot in 2010 or thereafter and will potentially face new barriers to citizens' initiatives created by the Florida legislature, the DOE and the SOEs.

Plaintiffs submit that it is difficult to imagine injuries to First Amendment speech and associational rights which are more irreparable than those just described.

## IV.    THE THREATENED INJURY TO PLAINTIFFS OUTWEIGHS ANY DAMAGE AN INJUNCTION MAY CAUSE DEFENDANT

No cognizable harm could be suffered by the defendant from an injunction prohibiting him from enforcing the demonstrably unconstitutional restrictions on access to the ballot discussed above and directing him to grant plaintiffs access to the November 2008 general election ballot.  While granting plaintiffs a preliminary injunction could conceivably displease Hometown Democracy's opponents, the "harm" they might suffer is certainly not the kind of harm that is cognizable by a court of law.

Plaintiffs need not be required to file any additional petition signatures, and the SOEs need not verify any additional signatures. In cases where courts have invalidated features of state ballot access laws on constitutional grounds, candidates have been granted access to the ballot without filing any petition signatures whatsoever. See, e.g., McCarthy v. Briscoe, 429 U.S. 1317 (1976);  McCarthy v. Askew, 540 F.2d 1254 (5th Cir. 1976);[4] McCarthy v. Slater, 553 P.2d 489 (Sup. Ct. Okla. 1976); Hall v. Austin, 495 F. Supp. 782 (E.D. Mich. 1980); Goldman-Frankie v. Austin, 727 F.2d 603 (6th Cir. 1984). In all of these cases, the candidate-plaintiffs' demonstration of a significant modicum of community support was sufficient to warrant an order that their names appear on the ballot. Plaintiffs submit that the same should hold true of the Hometown Democracy amendment.

## V.    THE INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST

---

[4] The Eleventh Circuit has adopted as binding precedent all  decisions of the former Fifth Circuit decided prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

20

An injunction would, in fact, advance the public interest. Denying plaintiffs access to the ballot on account of Florida's new early filing deadline and the other restrictions about which plaintiffs complain operates to thwart the core political speech inherent in circulating and signing citizens' initiative petitions and in voting for or against initiatives at the polling place. The public interest demands that plaintiffs' and the Florida electorate's rights to speak and associate politically be vindicated.

## VI.    PLAINTIFFS SHOULD NOT BE REQUIRED TO POST A SECURITY BOND

Although Fed.R.Civ.P. 65(c) would seem to condition the issuance of a preliminary injunction on the posting of a bond by plaintiffs, it is settled law that whether to require a bond is within the discretion of the Court. See, e.g., Tancogne v. Tomjai Enterprises Corporation, 408 F. Supp.2d 1237, 1252 (S.D. Fla. 2005) and cases cited therein; Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1176 (6th Cir. 1995). Plaintiffs urge that requiring a bond would discourage public interest litigation such as the case at bar and would serve no useful purpose, since the granting of a preliminary injunction would present no risk of economic harm to the defendant.

## CONCLUSION

For the foregoing reasons the Court is requested to enter a preliminary injunction (1)(a) prohibiting defendant from enforcing Florida's new early filing deadline for citizens initiative petitions; (b) prohibiting the continued use of disparate signature-verification criteria by the county Supervisors of Elections; and (c) invalidating Florida's new law granting private property owners the power to selectively permit or prohibit the circulation of citizens' initiative petitions on their premises; and (2) directing defendant to place the Hometown Democracy amendment on the November 4, 2008 general

21

election ballot. The Court is further requested to dispense with the requirement of a

security bond.

Dated this 3rd day of July, 2008.

Respectfully submitted,

Gary Sinawski
 E-mail: GSinawski@aol.com
 180 Montague Street 26 Floor
 Brooklyn, NY 11201
Tel: (516) 971-7783
Fax: (212) 581-1352


s/ *Lesley Blackner*
_____
Lesley Blackner
E-mail: LBlackner@aol.com
Florida Bar No. 654403
123 Australian Avenue
Palm Beach, FL 33480
Tel: (561) 659-5754
Fax: (561) 659-3184


Ross Stafford Burnaman
Email:  rossburnaman@earthlink.net
Florida Bar No. 32301
1018 Holland Drive
Tallahassee, FL  32301
Tel:  (850)942-1474


Attorneys for Plaintiffs


## **CERTIFICATE OF SERVICE**


I hereby certify that on the 3rd day of July, 2008, I electronically filed the

foregoing document with attached exhibits with the Clerk of the Court using CM/ECF

and also sent by First Class United States Mail the foregoing document to the following

counsel of record for the defendant in this action:

RICHARD E. DORAN
RDoran@Ausley.com
STEPHEN C. EMMANUEL
SEmmanuel@Ausley.com
Ausley & McMullen
227 South Calhoun Street (32301)
Post Office Box 391
Tallahassee, Florida 32302
(850) 224-9115; Fax: (850) 222-7560

LYNN C. HEARN
General Counsel
Florida Department of State
LCHearn@dos.state.fl.us
Office of the General Counsel
R.A. Gray Building
500 South Bronough Street
Tallahassee, FL 32399-0250
(850) 245-6536; Fax: (850) 245-6127


                                        s/ *Lesley Blackner*
                                        _____
                                        Lesley Blackner